# City of Pittsburgh v. The Pennsylvania Railroad

500

*H. Stewart Dunn*, for plaintiff.
*John David Rhodes*, for defendant.

NIXON, J., November 29, 1956.—This matter is before the court upon a case stated, counsel for the respective parties having stipulated that the matter in dispute should be adjudicated after oral and written argument upon the agreed statement of facts and questions of law. The ultimate question to be decided is whether or not defendant is liable to plaintiff for the sum of $5,831.69, which represents the cost of removing dirt, rock and other debris from a portion of Sycamore Street, a public thoroughfare in the city, which debris resulted from a landslide on January 10, 1951, originating from an abutting property which defendant allegedly owns.

The factual situation giving rise to the controversy is fully set forth in the stipulation, and briefly stated is as follows: The portion of Sycamore Street in ques-

tion was formerly situated where several of the railroad's east-west tracks are now located. In 1900 the city by ordinance authorized the Pittsburgh, Cincinnati, Chicago and St. Louis Railway to relocate and reconstruct Sycamore Street so that additional railroad tracks could be constructed. For the purpose of this suit, defendant Pennsylvania Railroad stands in the stead of P. C. C. and St. L., and references in this opinion to "the railroad" or to "defendant" shall mean either or both of these corporations. To accomplish this, the railroad proceeded to acquire by condemnation and purchase the lands south of the former location of Sycamore Street. The conveyances for these properties are in evidence. The railroad then constructed its tracks and cut into the steep hillside to relocate the street, completing the project in or about the year 1903. Since that time the street has been in public use and has been maintained exclusively by the city. It does not appear that any formal deed of dedication was given by the railroad, either for the street or for the adjacent slope whence the landslide in question originated.

The city bases its right to recover upon a municipal ordinance of July 16, 1903, originally enacted by the Council of the City of Allegheny (Ordinance Book 12, page 39) which provides that: "it shall be the duty of the owners and occupiers of any ground abutting upon any of the streets, lanes or alleys in the City of Allegheny to remove any dirt, mud or rubbish which may slip, slide or fall . . . from their ground or property over or upon any part of the sidewalk, footway or driveway of any such street, lane or alley." The ordinance also provides for notice to the owner to remove, for a penalty, and for removal of the obstruction by the city at the cost of the owner. This action is in assumpsit, but the parties have stipulated that if a technical trespass is involved, and we think it clear

that the landslide was a technical trespass, though the point in no way affects the case under the circumstances, the form of the action shall not affect plaintiff's rights.

## I. The Ordinance of July 16, 1903

The first question is whether the above mentioned ordinance is enforcible within those portions of the present City of Pittsburgh which were never a part of Old Allegheny. Defendant urges that this must be answered in the negative, and that therefore the ordinance does not apply to the land in question. However, plaintiff cites section 9 of the Act of February 7, 1906, P. L. 7, 53 PS §233, which allowed consolidation of the Cities of Pittsburgh and Allegheny. This section provides, inter alia:

"Effect of consolidation . . .

". . . all the ordinances of each of said cities shall be applicable in and to all the territory of the enlarged city, until amended or repealed; and if there be any conflict by reason of different ordinances in the two cities, the ordinance of the larger city shall control: Provided, That the laws applicable to and governing the consolidated city shall in all cases be supreme."

Of course the effect of the Act of 1906 is that legally both of the old cities ceased to exist as such and together became a new city known as Pittsburgh. The obvious purpose of the provision quoted above was to prevent the ridiculous situation of a general ordinance being law in one part of the new city but not in the rest of it. But if defendant's argument is correct with respect to an enactment of the Council of Old Allegheny, then it applies equally to any general ordinance enacted by the Pittsburgh Council prior to the consolidation. Undoubtedly our public officials would be surprised to learn that, under defendant's argument, there are scores of general ordinances which are not enforcible

in the north side section of the present city. The only reasonable conclusion is that the ordinance in question is "applicable in and to all the territory of the enlarged city."

However, defendant argues that the legislature intended such an arrangement to be only a temporary one, and that such ordinances should be enforcible only for a reasonable time, or until the enlarged city has had an opportunity to replace, repeal or amend them. The answer to this is simply that had the legislature so intended it should and would have provided that the ordinances would be effective only for a set period, unless sooner repealed, amended or reenacted. The act mentions no period of time, but instead provides that the ordinance is effective *"until amended or repealed."* The ordinance in question has never been repealed or amended by the present City of Pittsburgh.

Defendant has also raised a point that the ordinance is ineffective because of the act's provision with respect to conflicts, it being asserted that such a conflict existed by reason of the fact that Pittsburgh had no enactment on the subject, while Allegheny had one, and therefore the law of the former should control. This argument lacks any merit for the act specifically refers to "any conflict by reason of *different ordinances* in the two cities," and has no application to the situation here presented.

Nor is this a case, as counsel for defendant seems to suggest, where the city dusted off an ancient and forgotten law to fit this particular claim. We take judicial notice of the fact that the ordinance in question is clearly indexed by subject and set forth in its entirety in The Pittsburgh Municipal Digest, along with an explanatory note referring to the Consolidation Act of 1906. This comprehensive book was compiled and published by the city in 1938 and, while not supple-

mented to date, it has been kept in print and circulation, is well known and readily available. Certainly the city was aware of the ordinance in question and, nothing to the contrary appearing in the case, we must presume that the public officials have done their duty over the years and acted to enforce this as a matter of routine the same as any other ordinance of the City of Pittsburgh. The question has not arisen before because in all probability this is the first time that the amount involved was great enough to justify a judicial determination.

## II. The Constitutional Question

Defendant next proposes that the ordinance is nonetheless unenforcible because it undertakes to impose penalties and liability upon owners of land because of damages occasioned even by forces of nature, without any fault or negligence on the part of the owner, and that this is in violation of article I, section I, of the Pennsylvania Constitution and of section I of the Fourteenth Amendment to the United States Constitution. It is clear that the Ordinance of 1903 is within the powers specifically granted by the legislature to cities of the second class.

"To require the removal of all obstructions from sidewalks, curbstones, gutters, streets and street crossings, at the expense of the owners or occupiers of the ground fronting thereon, or at the expense of the person or persons placing the same there; . . .": Act of March 7, 1901, P. L. 20, art. XIX, sec. 3, cl. XII, 53 PS §23115.

Both Old Pittsburgh and Old Allegheny were second class cities in 1901, and that provision was applicable to both.

Therefore, to hold the ordinance unconstitutional would also involve holding unconstitutional the above quoted provision of the Charter Act of 1901. It is

axiomatic that the presumption is strongly in favor of constitutionality, and that a court can declare an act of assembly void, in whole or in part, only when it violates the Constitution clearly, palpably and plainly. The burden is heavy upon the one attacking the law to prove his position beyond any reasonable doubt.

Defendant has referred us to a number of cases, all from other jurisdictions, wherein the respective courts have held invalid statutes attempting to impose liability without fault. These cases are not directly in point; each involved tort liability; each involved direct and consequential damage to persons or to private rights; in none of them was public property or a public thoroughfare involved. We think the liability imposed by the ordinance here is entirely different and clearly distinguishable from that involved in the cases cited by defendant. There is no attempt here to impose responsibility without fault for injuries to persons or for damage to property. The ordinance places upon all owners the affirmative duty of removing from the public thoroughfare objects which have slipped or fallen thereon from their land. Such a duty is imposed upon one and all by the governmental body by virtue of its police power, as an incident to the ownership of property. In such a case the owner's liability does not depend upon fault; the concept of negligence is not even involved. There are a number of instances where such a duty arises by reason of ownership of property, the one most similar to the case at bar being that relating to sidewalks. The property owner can be compelled not only to keep his sidewalk in repair, but can also be required to keep it free of all obstructions, whether placed there by himself, by the forces of nature or even by a stranger. No reason has been pointed out why a similar duty cannot be imposed to remove debris sliding from the property upon any part

of the public thoroughfare, including the street or cartway.

The case of McCarthy v. Ference, 358 Pa. 485 (1948), illustrates the type of liability to which defendant's argument does apply. That was one of a number of actions arising from a tragic landslide which occurred in Aliquippa, where tons of rock tore loose from the hillside and descended upon a State highway. A bus was demolished and 20 of its passengers were killed. There as here, the original street had been vacated for the accommodation of railroad facilities, and a steep hillside had been cut into to construct a new road. But all the suits which arose from the accident were, of course, grounded upon the negligence of defendants in maintaining the hillside. To impose a rule of absolute liability in such a case would clearly be unconstitutional. However, that is not the case here. The ordinance in question does not purport to make the property owner responsible for injuries to persons or property caused by a landslide in its course. It only imposes upon the abutting owner the affirmative duty of removing the material which has fallen from their land and is obstructing the public right of way. This the governmental body may do.

In our opinion, defendant wholly failed to meet the burden imposed upon it as the challenger of the law in question and under such circumstances we would not be justified in declaring unconstitutional the ordinance, and along with it a provision of the Charter Act, which act as an entirety has been held constitutional on numerous occasions by our Supreme Court.

### III. Defendant's Interest in the Property

The next question is whether, as of January 10, 1951, defendant had any estate or interest in the land abutting on Sycamore Street that would make it subject as an owner or occupier to the duties, penalties

and obligations imposed by the Ordinance of 1903. In evidence are the deeds by which defendant acquired title to the property. These contain the provision "that any part of the land hereby conveyed remaining South of the relocation of Sycamore St. shall be used only as a slope for said Street." It seems clear that defendant acquired thereby a qualified fee, which is nonetheless a fee simple, even though the use of the land may be limited by the qualification. However, it is defendant's position that its possessory rights in the land were dedicated to the city along with the relocated street, and that at present it has only a reversionary interest in the event the street is ever abandoned by the city.

We must reject this theory because the facts of the case fail to support it. When Sycamore Street was relocated, defendant could easily have dedicated to the city the new street and the abutting slope, as is customary in these street relocation cases, but for some reason defendant failed to do so. There is no record of any formal deed of dedication. Indeed, all that can be gleaned from the agreed statement of facts is that the dedication of the street itself was informal, and acceptance and ratification was accomplished by continuous public use and by maintenance of the roadway by the city. In addition, the railroad is the registered owner of the land in question; and land is carried on the municipal tax books as owned by defendant, and local real estate taxes thereon are assessed in the name of defendant and paid by it as they become due. The simple fact is that the railroad is still the legal record owner in fee of the lands involved. Defendant could have ended its responsibility in 1903 but for some reason, the wisdom of which escapes us, it chose to retain legal title to the land lying to the south of the relocated street.

Nor, in our opinion, is defendant the holder of a mere empty title. True, the use of the land is severely limited by the deeds, and defendant could not erect a building or railroad equipment thereon. But the land was initially acquired, and the street relocated, not to aid the municipality, but for the benefit and accommodation of the railroad, as it enabled defendant to construct additional east-west tracks which even today are heavily used and essential in its operations. Even as an incidental benefit, it is elementary that any slope protection afforded to Sycamore Street is protection to the railroad tracks below. In addition, the ordinance before us imposes its obligations upon abutting owners, and does not distinguish on the basis of the use to which the land is put. Nor does it apply only to an owner actually in occupancy. We must conclude that defendant is the legal and beneficial owner of the land in question, and as such is subject to the duties, penalties and obligations imposed by the Ordinance of 1903.

### IV. Right or Duty to Maintain the Hillside

Which, if either, of the parties to this suit had the right, and/or duty to enter upon the lands in question, to dress, support and otherwise maintain the hillside? Defendant argues that the city acquired the right to use this land as a slope, as an incident to dedication and acceptance of the relocated street. It is true that a city may lawfully occupy private property for slope or embankment purposes if necessary in connection with a street. See Act of May 1, 1876, P. L. 86, sec. 1, 53 PS §557. However, the municipal authorities must act under the power of eminent domain to do so, and pay for the taking of private property. There is nothing to indicate that the city ever exercised this power as to the property involved, or ever made any effort to enter upon it, and the record indicates that defend-

ant never granted its slope rights or any easement therein to the city, but on the contrary retained title in itself.

As to the duty to maintain the hillside, it would seem that the primary duty is in defendant as owner, with a secondary duty on the municipal body to protect the public safety. In our opinion this is largely a moot question, since the stipulation expressly provides that no question of negligence on the part of either party is involved in the case. For the purposes of this suit, the landslide was caused solely by forces of nature, and not by the failure of either party in its duty to maintain and support the hillside.

### V. Formal Notice Requirements of the Ordinance of 1903

Finally, we must decide whether or not defendant waived the notice requirements to which it was entitled. The ordinance provides for written notice to the owner to remove the debris obstructing the public street and, if the same is not complied with and removal must be made by the city, for the furnishing of a bill and notice for the cost and expenses of removal. Under the stipulation, it is admitted that the city did not serve upon defendant written notice of the occurrence of the landslide, nor a written request to remove the obstruction nor a written request to pay all or part of the cost. However, the stipulation also sets forth that defendant had *actual* notice of the slide, of the obstruction and of the city's efforts to remove the debris. At a subsequent conference between representatives of the parties defendant was requested to, and refused to, pay all or part of the cost. The purpose of notice requirements in any act or ordinance is to insure that the affected parties will have an opportunity to assert or protect their rights so that the same will not be summarily prejudiced. Obviously, since defendant

had *actual* and prompt notice, and discussed the problem with the city's representatives before refusing to pay, it cannot now stand upon a mere technicality and insist that it did not have proper notice.

We therefore must conclude that under the facts of this case, and under our interpretation of the law applicable thereto, defendant is liable to plaintiff for the specified sum of money for the cost of removing from Sycamore Street debris deposited by the landslide of January 10, 1951.

### Order

And now, November 29, 1956, for the reasons set forth in the foregoing opinion, judgment is hereby rendered in favor of plaintiff, City of Pittsburgh, and against defendant, The Pennsylvania Railroad, in the sum of $5,831.69, with interest from April 1, 1951.

### Order

NIXON, J., December 10, 1956.—And now, December 10, 1956, It is ordered that the order of court of November 29, 1956, is hereby vacated and the following is substituted therefor:

And now, November 29, 1956, for the reasons set forth in the foregoing opinion, it is the decision of this court that defendant, The Pennsylvania Railroad, is liable to plaintiff, City of Pittsburgh, in the sum of $5,831.69, with interest from April 1, 1951.

### Memorandum

This case is before the court on defendant's exceptions to the opinion filed November 29, 1956, on a case stated, and to the order finding in favor of the plaintiff. The exceptions were argued orally on February 13, 1957, and plaintiff filed its brief. To date defendant has filed no brief in support of its exceptions. The court's opinion of November 29, 1956, thoroughly covered the matters raised in the exceptions, and this court en banc concurs therein. We do not believe it is

necessary to write another opinion on the same subject matter.

### Order

Nixon, J., January 31, 1958.—And now, January 31, 1958, the exceptions ex parte defendant to the opinion and order filed November 29, 1956, as amended by the order of December 10, 1956, are hereby dismissed, and it is ordered that judgment be entered in favor of plaintiff, City of Pittsburgh, and against defendant, The Pennsylvania Railroad, in the sum of $5,831.69 with interest from April 1, 1951, at the rate of six percent per annum.

Eo die, exception noted to defendant, and bill sealed.