THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ROBERT CIARDULLO, Appellant.

Second Department, December 24, 1984

### APPEARANCES OF COUNSEL

*Edwin J. Mulhern* for appellant.

*Denis Dillon, District Attorney* (*Anthony J. Girese* and *Lorna N. Graham* of counsel), for respondent.

### OPINION OF THE COURT

*Per Curiam.*

The defendant stands convicted, upon a jury verdict, of the crimes of attempted hindering prosecution in the first degree (Penal Law, §§ 110.00, 205.65) and attempted tampering with physical evidence (Penal Law, §§ 110.00, 215.40). The record establishes beyond a reasonable doubt that the defendant *intended* to commit the crimes of hindering prosecution and tampering with physical evidence if he had been afforded the opportunity to do so. The question before us is whether the defendant's acts in preparation to commit the crimes and in furtherance of his intention to commit them are sufficient to constitute the crime of attempt. Stated somewhat differently, the question is whether the defendant committed an overt act or acts which went beyond the stage of mere preparation. We conclude that he did not.

On Thursday, June 17, 1982, a large number of people attended a picnic at Eisenhower Park in East Meadow, New York. Among the picnickers were William McFarland, Stephen Murphy, Patricia Puerto and the defendant Robert Ciardullo. Sometime that evening Patricia Puerto, Stephen Murphy and the defendant left the picnic in Murphy's automobile. Patricia Puerto was never to be seen alive again.

According to testimony adduced at the trial, Stephen Murphy, Patricia Puerto and defendant drove to a large wooded tract of land known as "Brett's Estate" where Stephen Murphy and Patricia Puerto ingested PCP, or angel dust as it is more commonly known, which had been supplied by defendant. When Patricia resisted Stephen Murphy's repeated sexual advances, Murphy strangled the girl until she stopped breathing. After she was dead Murphy ripped the girl's clothes off and spread her legs to give the appearance of a rape. Murphy and defendant left the body in Brett's Estate and went to a bar in Westbury, New York. Afterwards, defendant went home. As an aside it should be noted that Stephen Murphy has been convicted of manslaughter in the first degree, upon his plea of guilty, and is currently in prison on that conviction.

Two days after the homicide, namely, on June 19, 1982, while William McFarland was at Brett's Estate with his girlfriend and his younger brother, he accidentally came upon the body of Patricia Puerto. After McFarland left that area he met defendant and Murphy and told them what he had witnessed. Later that same day, the three men met again and McFarland testified that during the meeting defendant and Murphy indicated that they wanted him to help them drag the body deeper into the woods. McFarland had no further contact with defendant that night.

On Sunday evening, June 20, 1982, the body was discovered by a passerby and the area was secured by the police. As a result of newspaper accounts of the homicide, Patricia Puerto's body was identified and following police interviews with a number of people who had attended the picnic, Murphy and defendant were arrested. Toward the end of a question and answer period at police headquarters defendant stated that he and Murphy went back to Brett's Estate on the night of June 19 or 20 but they just drove by and never looked to see if the body was still there because a police car was present. When asked why they returned to the scene defendant responded: "Because we figured we would get caught, I guess, if it was there, so we wanted to move it back a little bit."

By indictment No. 55079 defendant was charged as follows:
"THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, accuse the defendant of the crime of AN ATTEMPT TO COMMIT THE CRIME OF HINDERING PROSECUTION IN THE FIRST DEGREE committed as follows:

"The defendant, ROBERT CIARDULLO, in, on or about June 19, 1982, and in, on or about June 20, 1982, in the County of Nassau, State of New York, did attempt to render criminal assistance to STEPHEN MURPHY who had committed the Class A Felony of Murder in the Second Degree, knowing and believing that STEPHEN MURPHY had engaged in conduct constituting the Class A Felony of Murder in the Second Degree by attempting to suppress by an act of concealment the body of Patricia Puerto who was the victim of said crime.

"COUNT TWO

"AND THE GRAND JURY OF THE COUNTY OF NASSAU, by this indictment, further accuses the defendant of the crime of AN ATTEMPT TO COMMIT THE CRIME OF TAMPERING WITH PHYSICAL EVIDENCE committed as follows:

"The defendant, ROBERT CIARDULLO, in, on or about June 19, 1982, and in, on or about June 20, 1982, in the County of Nassau, State of New York, believing that certain physical evidence was about to be produced and used in an official proceeding or a prospective official proceeding, and with the intent to prevent such production or use, he did attempt to suppress the body of Patricia Puerto by an act of concealment.

"All of the acts and transactions alleged in each of the several counts in this indictment are connected together and form part of a common scheme and plan."

On appeal, defendant contends, *inter alia,* that his actions were insufficient as a matter of law to constitute an attempt. Based upon the record before us and applicable precedent, we agree with defendant's contention.

Section 110.00 of the Penal Law states that "[a] person is guilty of an attempt to commit a crime when, with intent to commit a crime, he engages in conduct which tends to effect the commission of such crime". It has been said that "the law of attempt exists because there is just as much need to stop, deter and reform a person who has unsuccessfully attempted or is attempting to commit a crime than one who has already committed such an offense." (LaFave & Scott, Criminal Law, § 59, p 426.) To constitute an attempt it must be established that the defendant acted with a specific intent, that is, that he intended

to commit a specific crime (see, e.g., *People v Bracey,* 41 NY2d 296, 300; *People v Kane,* 161 NY 380) and it must be proven that the defendant acted to carry out his intent.

Both elements must be established because it has long been held that the law does not punish evil thoughts without more (*People v Sullivan,* 173 NY 122; *People v Collins,* 234 NY 355; *People v Werblow,* 241 NY 55; *People v Rizzo,* 246 NY 334; *People v Bracey, supra*). As noted by Judge Wachtler in *People v Bracey* (*supra,* p 300): "In most attempt cases, the defendant's actual intent or purpose is not in issue and the only questions are whether he committed an overt act which went beyond the stage of mere preparation (*People v Sullivan, supra; People v Collins, supra; People v Werblow, supra; People v Rizzo,* 246 NY 334, *supra; People v Mirenda,* 23 NY2d 439; *People v Di Stefano, supra*) or whether it was impossible to accomplish the act intended (*People v Moran,* 123 NY 254; *People v Gardner,* 144 NY 119; *People v Jaffe,* 185 NY 497; *People v Teal,* 196 NY 372, but now see Penal Law, § 110.10)." As we have pointed out, *supra,* defendant does not dispute the fact that he possessed the requisite culpable mental state for the commission of the underlying crimes. Indeed, the defendant admitted that he and Murphy intended to move Patricia's body further back into the woods in order to make it more difficult to find. Thus, the People established beyond a reasonable doubt that the defendant was imbued with the requisite specific intent.

However that may be, we are satisfied that the People failed to meet their burden of establishing beyond a reasonable doubt that the defendant committed an overt act which went beyond the stage of mere preparation. One notable treatise discusses the "overt act" element of the crime of attempt in these words: "it is not enough that the defendant have [*sic*] intended to commit a crime. There must also be an act, and not any act will suffice. Precisely what kind of act is required is not made very clear by the language which has traditionally been used by courts and legislatures. It is commonly stated that more than an act of preparation must occur, which perhaps is of some help" (LaFave & Scott, Criminal Law, § 59, pp 431-432).

In *People v Werblow* (241 NY 55, 61-62, *supra*), Judge Cardozo elaborated on the foregoing, summing up the overt act requirement as follows: "Acts in furtherance of a criminal project do not reach the stage of an attempt unless they carry the project forward within dangerous proximity to the criminal end to be attained (HOLMES, J., in *Hyde* v. *U.S.,* 255 U.S. 347, 387). Where

the line is to be drawn will differ with different crimes (*People* v. *Collins,* 234 N.Y. 355, 359; *People* v. *Sobieskoda,* 235 N.Y. 411, 419; cf. cases collated in 9 Halsbury Laws of England, § 539). Wherever it is drawn, it marks the division between promise and partial or complete fulfillment (*People* v. *Collins, supra*)."

With these principles in mind we turn to two cases which illustrate the direction taken by the courts in New York. A leading case is *People v Rizzo* (246 NY 334, *supra*), wherein the defendant was still searching for his victim when arrested. In that case, the defendant Charles Rizzo, with three others, planned to rob a bank messenger named Rao of a payroll that he was carrying. The four men drove around to various places where it was expected that the messenger would make deliveries but, as fate would have it, they were arrested before they found him. In reversing the defendant's conviction for attempted first degree robbery (two of the prospective perpetrators were armed) a unanimous Court of Appeals (Crane, J.), pronounced what has since been referred to as the *"Rizzo* rule" (see *People v Di Stefano,* 38 NY2d 640, 652, 653) holding:

"It is perfectly evident that there will arise differences of opinion as to whether an act in a given case is one *tending* to commit a crime. 'Tending' means to exert activity in a particular direction. Any act in preparation to commit a crime may be said to have a tendency towards its accomplishment * * * The law, however, has recognized that many acts in the way of preparation are too remote to constitute the crime of attempt. The line has been drawn between those acts which are remote and those which are proximate and near to the consummation. The law must be practical, and, therefore, considers those acts only as tending to the commission of the crime which are so near to this accomplishment that in all reasonable probability the crime itself would have been committed but for timely interference * * *

"The method of committing or attempting crime varies in each case so that the difficulty, if any, is not with this rule of law regarding an attempt, which is well understood, but with its application to the facts * * *

"To constitute the crime of robbery the money must have been taken from Rao by means of force or violence, or through fear. The crime of attempt to commit robbery was committed if these defendants did an act tending to the commission of this robbery. Did the acts above describe [*sic*] come dangerously near to the taking of Rao's property? Did the acts come so near the commission of robbery that there was reasonable likelihood of its

accomplishment but for the interference? Rao was not found; the defendants were still looking for him; no attempt to rob him could be made, at least until he came in sight; he was not in the building at One Hundred and Eightieth street and Morris Park Avenue. There was no man there with the payroll for the United Lathing Company whom these defendants could rob. Apparently no money had been drawn from the bank for the payroll by anybody at the time of the arrest. In a word, these defendants had planned to commit a crime and were looking around the city for an opportunity to commit it, but the opportunity fortunately never came" (*People v Rizzo*, 246 NY 334, 336-338, *supra*).

In *People v Pollaci* (68 AD2d 71) this court was faced with an interesting scenario. Prior to February, 1977, the defendant and his accomplices were observed by a detective riding around in a Chrysler automobile with, what the detective later determined to be, switched license plates. On February 1, 1977, the detective observed the vehicle drive up to a supermarket at which time the defendant and one of the other men entered the store, stayed about 15 minutes, and came out empty handed. On February 4, 1977, the same detective saw the Chrysler automobile continually circling the parking lot and block on which the supermarket was situated and the defendant was observed casing the surrounding area. The next evening, namely, February 5, 1977, the defendant and one other man drove into the parking lot, got out of the car and approached the entrance to the closed supermarket. As a police patrol car rounded the corner the accomplice had both of his hands on the supermarket door and his face was close to the glass. Upon observing the police car, the defendant tapped his ally on the back, and both men turned immediately and walked in the direction of their parked car. The defendant was placed under arrest for attempted robbery and a search of the Chrysler vehicle turned up a revolver and a homemade bludgeon. In affirming only the defendant's conviction for criminal possession of a weapon in the third degree we held (68 AD2d 71, 75, *supra*): "As the People properly concede, the conduct observed did not constitute attempted robbery. There was no overt act which went beyond the state of mere preparation and the law does not punish evil thoughts (see *People v Bracey,* 41 NY2d 296, 300). When the defendants were interrupted by the arrival of the police car, they had gone no further than to stand at the entrance of the supermarket after it closed, Raiola looking through the glass and appellant keeping watch."

Manifestly, the act of Murphy and defendant in the case at bar, i.e., driving to Brett's Estate without leaving the automobile apparently without getting closer than several hundred feet

from the body, falls short of the acts done in the *Rizzo* (*supra*) and *Pollaci* (*supra*) cases to commit the intended crimes. It can hardly be said that one comes dangerously close to tampering with physical evidence or to hindering prosecution by driving towards the scene of a homicide and then turning around several hundred feet away from the victim's body without even getting out of the automobile.

It is true that the defendant and Murphy went to the scene for the specific purpose of moving Patricia's body, a purpose which is concededly reprehensible. While it may be that the fortuitous presence of the police car at Brett's Estate prevented them from carrying out their foul scheme, the fact remains that their actions up to the point where they retreated from the estate were insufficient, as a matter of law, to support an attempt conviction. This is so, for, as set forth above, in determining whether an attempt conviction may stand, we must look at the conduct of the accused and consider only those acts "as tending to the commission of the crime which are so near to its accomplishment" (*People v Rizzo, supra,* p 337). Merely driving close to the homicide scene, without more, is too remote an act upon which to predicate these convictions. If Murphy and/or the defendant had alighted from the vehicle and had begun walking towards the body with a shovel in hand or had undertaken some similar conduct then, perhaps, the outcome of this case would be different because it could then be argued that they had embarked on the act of concealment of the body of Patricia Puerto. However, those are not the facts before us.

Our reversal herein should not be perceived as naiveté on our part. It does not require a superabundance of knowledge to opine that but for their having observed the police car at the scene Murphy and the defendant in all likelihood would have left their vehicle, entered the woods and concealed Patricia's body. In the *Pollaci* case (*supra*), one could as easily conclude that the supermarket would have been burglarized but for the arrival of the police. However, the law does not permit us to speculate as to what might have actually occurred but for the arrival or presence of the police. Our function is to determine whether or not the steps taken by the defendant amounted to the commission of a crime, as defined by our law. In this case, they did not. Accordingly, the judgment appealed from must be reversed and the indictment dismissed.

MANGANO, J. P., GIBBONS, BRACKEN and NIEHOFF, JJ., concur.

Judgment of the County Court, Nassau County, rendered September 21, 1983, reversed, on the law, indictment dismissed and matter remitted to the County Court, Nassau County, for the purpose of entering an order in its discretion pursuant to CPL 160.50.